**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONALD CHARLES MOTT,**

                                **Plaintiff,**

v.                                                                   **5:16-CV-951 (BKS)**

**NANCY A. BERRYHILL, Acting Commissioner**
**of Social Security,[1]**

                                **Defendant.**
_____

**Appearances:**

Counsel for Plaintiff:
Charles E. Binder
Law Offices of Harry J. Binder and
Charles E. Binder, P.C.
60 East 42nd Street, Suite 520
New York, NY 10165

Counsel for Defendant:
Grant C. Jaquith, Acting United States Attorney
Lorie E. Lupkin, Special Assistant U.S. Attorney
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Donald Charles Mott filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3)

seeking review of a decision by the Acting Commissioner of Social Security denying Plaintiff's

---

[1] The Clerk of the Court is directed to substitute as Defendant Nancy A. Berryhill, the current Acting Commissioner of Social Security.

application for Social Security Disability Insurance Benefits.  (Dkt. No. 1).  The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court.  (Dkt. Nos. 9, 12).  After carefully reviewing the Administrative Record (Dkt. No. 7), and considering the parties' arguments, the Court affirms the decision of the Commissioner.

## II.    BACKGROUND

### A.    Procedural History

On January 8, 2011, Plaintiff filed an application for disability benefits, with an onset date of January 27, 2010.[2]  (R. 178-79).  Plaintiff's claim was denied (R. 99-110), and he requested a hearing before an Administrative Law Judge ("ALJ").  (R. 111-12).  A hearing was held before ALJ Roberto Lebron on January 13, 2012.  (R. 37-64).  On May 11, 2012, ALJ Lebron issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 21-30).  Plaintiff requested review of the decision by the Appeals Council, which denied review on June 4, 2013.  (R. 3-6, 15-16).  On July 28, 2013, Plaintiff commenced a civil action in the Northern District of New York, *see* No. 13 Civ. 884 (GLS/RFT), challenging Defendant's decision.  On March 24, 2014, at the request of the parties, United States District Court Judge Gary L. Sharpe remanded the matter to the Commissioner for further administrative action and dismissed Plaintiff's civil case.  (R. 679-80).

The Appeals Council then issued an Order on December 14, 2014, vacating the ALJ's decision and remanding Plaintiff's application to an ALJ for further evaluation.  (R. 681-85). The Order directed the ALJ to: 1) reevaluate all of the claimant's impairments and make a

---

[2] Plaintiff previously applied for disability benefits on October 1, 2007, alleging disability as of November 10, 2006; however, Administrative Law Judge Rebecca LaRiccia ultimately found that Plaintiff was not disabled in a decision dated January 26, 2010.  (R. 68-76).

determination of the severity of said impairments based on all of the medical evidence in the record; 2) reconsider all of the mental and physical medical source evidence and opinions pursuant to the provisions of 20 C.F.R. 404.1527 and Social Security Rulings 96-2p and 96-5p, specifically the opinions of Dr. Sherif El Bayadi and Robert L. Carhart, and provide appropriate rationale to explain the weight given to such opinion evidence; 3) give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of all of the assessed limitations (20 C.F.R. 404.1545 and Social Security Ruling 96-8p); 4) if warranted, obtain medical expert testimony to clarify the severity of the claimant's mental impairment(s); and 5) obtain testimony from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-12).  (R. 684-85).

A second hearing was held on June 15, 2015, this time before ALJ Marie Greener.  (R. 591-626).  On July 24, 2015, ALJ Greener issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 572-84).  On August 11, 2015, Plaintiff requested review of this decision by the Appeals Council, which declined to assume jurisdiction.  (R. 552-57, 562).  On July 29, 2016, Plaintiff commenced this action.  (Dkt. No. 1).

### B.    Plaintiff's Background and Testimony

Plaintiff was born on December 11, 1962 and has a high school education.  (R. 40-42). Plaintiff worked for approximately 22 years as an engraver, until November 12, 2006 or thereabouts.  (R. 42-43).  Plaintiff testified that he stopped working "because my back was bothering [me] to the point where I was working a couple of hours a day."  (R. 44).  Plaintiff further testified that he stopped "because my back and my lungs – it's in a shop setting where

3

there's a lot of dust and particles in the air and it just got to be where I would be coughing all day and the bending was really disturbing to my back."  (R. 44).

Plaintiff testified that he cannot work because of "constant back pain" and shortness of breath.  (R. 45).  Plaintiff also stated that the lower back pain goes down his to his thighs, which become painful and numb.  (R. 45-46).  This happens when Plaintiff stands for "maybe more than 10 or 15 minutes."  (R. 50).  Plaintiff's conditions also caused him stiffness in the shoulders and elbows.  (R. 46).  Plaintiff testified that his back pain affected his ability to walk, in that he could only walk for approximately 10 to 15 minutes before he had to stop, and usually lie down. (R. 53-54).  Plaintiff said that he could only stand for approximately 10 to 15 minutes before he had to sit down.  (R. 54).  Plaintiff also testified that he had difficulty bending and squatting, and that he could only sit for approximately 45 minutes before he had to stand up.  (R. 54-56).

Plaintiff testified that he had sleep apnea, which although treated with a CPAP machine[3] and oxygen, caused him to "only get maybe three to four hours of sleep during the evening," such that he fell asleep several times during the day.  (R. 46, 58).  This condition caused Plaintiff to feel exhausted during the day.  (R. 58-59).  Plaintiff also testified that he had "severe" breathing problems.  (R. 56).  Plaintiff said that he could only walk a block or two before he was unable to catch his breath, and that his breathing was "somewhat difficult" all the time, including when he was seated or lying down.  (R. 61).  Plaintiff further testified that all of his problems affected his ability to concentrate and left him "mentally exhausted."  (R. 62).

---

[3] CPAP refers to continuous positive airway pressure and is used to keep breathing airways open; "[i]t involves using a CPAP machine that includes a mask or other device that fits over your nose or your nose and mouth, straps to position the mask, a tube that connects the mask to the machine's motor, and a motor that blows air into the tube. CPAP is used to treat sleep-related breathing disorders including sleep apnea."  *See CPAP*, https://www.nhlbi.nih.gov/health/health-topics/topics/cpap (last visited July 11, 2017).

As of the June 15, 2015 hearing, Plaintiff stated that he was five feet and seven inches tall and weighed 255 pounds.  (R. 40).  Plaintiff testified that he can shower and dress himself, but that he cannot put his socks on by himself.  (R. 59).  Plaintiff's wife and daughter do the cooking, laundry, and most of the shopping.  (R. 59-60).  On a daily basis, Plaintiff puts his daughter on the bus, tries to catch up on rest, gets his daughter off the bus, and helps with her homework.  (R. 60).

### C. Medical Evidence and Opinions

#### 1. Dr. Cheryl Clark

Plaintiff began treating with Dr. Clark, a general practitioner, on July 2, 2009.  (R. 312). X-rays requested by Dr. Clark showed that on July 14, 2009, Plaintiff had degenerative disc disease at L5-S1, with disc space narrowing, sclerotic changes and hypertrophic spurring at L4-5, and minimal arthritic spurring at L3 and L4.  (R. 282).  On December 22, 2009, Plaintiff complained of back pain and shortness of breath; his weight at the time was 268 pounds.  (R. 300).  On examination, Dr. Clark found decreased breath sounds and lumbar spine tenderness and diagnosed hypertension and Chronic Obstructive Pulmonary Disease ("COPD").  (R. 300-01).  Plaintiff saw Dr. Clark again on February 15, 2010 and reported back pain and that his breathing was worse.  (R. 278).  On examination, Dr. Clark observed decreased breath sounds, lumbar spine tenderness, and a depressed mood.  (R. 278).  Plaintiff returned on April 16, 2010 and his condition remained the same; Dr. Clark noted that Plaintiff could not do anything that required him to lift over 10 pounds, could not walk long distances, and could not bend or kneel. (R. 276-77, 280-81).

5

On April 20, 2010, Dr. Clark completed a Multiple Impairment Questionnaire for Plaintiff, where she diagnosed degenerative disc disease of the back, hypertension, and COPD, and indicated Plaintiff's prognosis was "fair." (R. 262-69). Dr. Clark stated that her diagnoses were supported by X-rays, pulmonary function testing, and laboratory blood tests. (R. 263). Dr. Clark identified Plaintiff's primary symptoms as shortness of breath, with exertion and at rest, and lower back pain with numbness and tingling with more than 5 minutes of activity. (R. 263). Dr. Clark noted that Plaintiff reported constant lower back pain and estimated that his pain was "moderately severe," 8 on a 10-point scale. (R. 263-64). Dr. Clark opined that Plaintiff was able to sit for less than 1 hour and "stand/walk" for only 2 hours total in an 8-hour workday; he needed to get up and move around every 15 to 20 minutes when sitting. (R. 264). Plaintiff could lift and carry 5-20 pounds occasionally and up to five pounds frequently. (R. 265). Plaintiff had "significant limitations" performing repetitive reaching, handling, fingering, and lifting; Plaintiff had no limitations for grasping, turning, and twisting objects. (R. 265). Dr. Clark found that Plaintiff's pain, fatigue, or other symptoms were "constantly" "severe enough to interfere with [his] attention and concentration." (R. 266). Plaintiff required breaks to rest every 15 to 20 minutes during the day. (R. 266). Dr. Clark estimated that Plaintiff would miss work "[a]bout two to three times a month" due to his impairments. (R. 268). Dr. Clark also stated that Plaintiff would need to avoid fumes, gases, temperature extremes, and dust at a regular job, and further, that he could not push, pull, kneel, bend, or stoop. (R. 268). Finally, Dr. Clark stated that Plaintiff's symptoms and limitations were present since July 2009 and were expected to continue for at least 12 months. (R. 266, 268).

Plaintiff saw Dr. Clark again on May 20, 2010 and June 16, 2010, and his condition remained largely the same.  (R. 272-75).

### 2.    Dr. Sherif El Bayadi

Plaintiff began treating with Dr. El Bayadi, a pulmonologist, on December 8, 2010, when Plaintiff underwent a sleep study that indicated "severe obstructive sleep apnea."  (R. 436-37).  Plaintiff weighed 284 pounds at the time; Dr. El Bayadi recommended CPAP therapy and a weight reduction program.  (R. 437).  Plaintiff saw Dr. El Bayadi again on December 30, 2010 regarding his sleep apnea; Plaintiff's complaints included snoring, choking arousals throughout the night, and daytime somnolence.  (R. 438).  Plaintiff reported that his back pain interrupted sleep, and that he napped for short intervals throughout the day.  (R. 438).  Plaintiff said that he smoked one to two cigarettes a day, and that he planned to quit.  (R. 438).  In addition, Plaintiff reported problems with short term memory loss, hypertension, shortness of breath with exertion, and leg numbness.  (R. 438).  Plaintiff weighed 288 pounds at the time, with a body mass index ("BMI") of 43.  (R. 439).  On examination, Dr. El Bayadi noted that Plaintiff had a "very narrow airway," and after listening to Plaintiff's chest, noted a "few ronchi with a slight wheeze that cleared after cough."  (R. 439).  Pulmonary function tests showed "mild obstructive airways." (R. 439).  Dr. El Bayadi diagnosed obstructive sleep apnea; he recommended CPAP therapy along with use of a dental device.  (R. 439).

On February 18, 2011, Plaintiff returned and reported difficulties breathing against the pressure of his CPAP.  (R. 424).  Plaintiff stated that he was still waking up frequently during the night, but had some improvement in his daytime somnolence.  (R. 424).  On examination, Dr. El Bayadi noted that Plaintiff's lungs were clear throughout, "with no wheezes, rales, or rhonchi,"

and a 96% oxygen saturation rate with room air.  (R. 424).  Pulmonary function testing showed "normal diffusion."  (R. 424).  Dr. El Bayadi recommended Plaintiff use a nasal pillow mask for his CPAP.  (R. 424).  Chest X-rays on February 18, 2011 were negative.  (R. 864).

On June 1, 2011, Dr. El Bayadi completed a Sleep Disorders Impairment Questionnaire for Plaintiff.  (R. 443-47).  Dr. El Bayadi diagnosed obstructive sleep apnea and obstructive airway disease, and noted that Plaintiff's prognosis was good with therapy.  (R. 443).  Clinical findings included excessive daytime sleepiness, sleep apnea, fatigue, obesity, chronic pulmonary problems, hypertension, and a BMI of 48.  (R. 443-44).  Dr. El Bayadi also cited polysomnographic studies that supported his findings.  (R. 444).  Plaintiff's primary symptoms were excessive daytime sleepiness and fatigue.  (R. 444).  Dr. El Bayadi opined that Plaintiff should avoid work involving climbing and heights, power machines, moving machinery or other hazardous conditions.  (R. 445).  He also stated that Plaintiff had "serious limitations" in maintaining concentration for two hour segments, needed unpredictable breaks during the work-day, and could only tolerate low stress; he estimated that Plaintiff would be absent from work an average of two to three times a month.  (R. 446-47).

### 3.    Dr. Robert Carhart

Plaintiff began treating with Dr. Carhart, a cardiologist, on March 4, 2011.  (R. 373). Plaintiff reported chronic shortness of breath, lightheadedness, and lower extremity swelling, and that his blood pressure was well-controlled with medication.  (R. 373).  Dr. Carhart noted that Plaintiff was "carrying a diagnosis of asymmetric hypertrophic cardiomyopathy[4] with actually

---

[4] Hypertrophic cardiomyopathy "is a disease in which the heart muscle (myocardium) becomes abnormally thick (hypertrophied)," and "[t]he thickened heart muscle can make it harder for the heart to pump blood."  *See*

the hypertrophic obstructive cardiomyopathy based on a mild left ventricular outflow tract gradient," but "not all of [Plaintiff's] symptoms are consistent with this diagnosis."  (R. 374). Dr. Carhart found that Plaintiff's EKG showed a sinus rhythm of 98, and that he did "not actually even have a significant voltage criteria for LVH (left ventricular hypertrophy)."  (R. 374).  Dr. Carhart also noted that Plaintiff's lungs were clear bilaterally and advised Plaintiff to continue his medications.[5]  (R. 374).  On June 10, 2011, Plaintiff reported continued shortness of breath; he also had occasional dizziness and lightheadedness when getting up too quickly and at times with walking, plus fatigue and ongoing back pain.  (R. 452).  An echocardiogram showed left ventricular hypertrophy and diastolic dysfunction.  (R. 452).  Dr. Carhart noted that Plaintiff's cardiac status was stable and without symptoms, and his lungs were clear.  (R. 452-53).  On September 15, 2011, Dr. Carhart found that, from a cardiac standpoint, Plaintiff remained stable.  (R. 454-55).  Plaintiff reported that he "keeps active and he rides a stationary bike a little bit every day."  (R. 454).

On September 15, 2011 Dr. Carhart completed a Cardiac Impairment Questionnaire for Plaintiff, where he diagnosed hypertrophic cardiomyopathy and hypertensive heart disease and noted that Plaintiff's prognosis was fair.  (R. 522-27).  Clinical findings included chronic shortness of breath, which Dr. Carhart identified as Plaintiff's "primary symptom," fatigue, weakness, lower extremity edema, lightheadedness, and chronic back pain.  (R. 522).  Dr.

---

*Hypertrophic cardiomyopathy*, http://www.mayoclinic.org/diseases-conditions/hypertrophic-cardiomyopathy/home/ovc-20122102 (last visited July 11, 2017).

[5] As of February 15, 2011, Plaintiff reported taking the following medications: Spiriva inhaler, Symbicort inhaler, Albuterol nebulizer, Ventolin inhaler, Fluticasone nasal spray, Singulair, Nexium, Gabapentin, Simvastatin, Chantix, Exforge, Ambien, and Tramadol.  (R. 344).

Carhart also cited an echocardiogram supporting his findings. (R. 523). Dr. Carhart did not fill out the portions of the Questionnaire concerning Plaintiff's functional limitations. (R. 524-26).

In a letter dated January 13, 2012, Dr. Carhart opined that Plaintiff was limited from any type of lifting or environmental strain, which would cause an increase in his blood pressure. (R. 529). Dr. Carhart also noted that Plaintiff's cardiac condition limited him from exposure to environmental extremes and excessive stress. (R. 529). Further, Dr. Carhart stated that from a non-cardiac standpoint, "because of issues with his back which is being treated by orthopedists, he is having problems standing and sitting for periods of time." (R. 529).

### 4.    North Medical Family Physicians

Plaintiff began treating at North Medical Family Physicians on November 1, 2010; on his first visit he reported chronic upper and lower back pain. (R. 342). Most of Plaintiff's appointments were with Vincent Gemelli, a Registered Physician Assistant ("RPA"), who diagnosed uncontrolled hypertension, COPD, wheezing, cardiomegaly, lower extremity neuropathy, allergies, sleep apnea, and lumbar radiculopathy. (R. 342). On November 26, 2010, Plaintiff underwent X-rays and a report was sent to RPA Gemelli, which stated that Plaintiff had "lower thoracic and lumbar degenerative disc disease, most severe at L4-5 and L5-S1, and moderate lower lumbar degenerative facet disease." (R. 335). On December 30, 2010, Plaintiff underwent an MRI of the lumbar spine and a report was sent to RPA Gemelli, which stated that Plaintiff had "narrowing of the bulging L5-S1 intervertebral disc, lateral right L5-S1 disc protrusion into the neural foramen, and moderate degenerative spinal stenosis at the L4-5 level." (R. 328).

10

On January 5, 2011, Plaintiff returned and RPA Gemelli diagnosed lumbar degenerative disc disease.  (R. 320).  On January 26, 2011, RPA Gemelli added tobacco abuse to Plaintiff's assessment and advised him to stop smoking.  (R. 322).  Plaintiff did not report shortness of breath at the time and his respiratory and cardiovascular symptoms were normal.  (R. 486-87). On March 13, 2011, Plaintiff again reported no shortness of breath.  (R. 490).  On May 12, 2011, Plaintiff reported that he had started smoking again; he was noted to also have asthma and insomnia; otherwise his assessment remained largely the same.  (R. 469).  Plaintiff's respiratory and cardiovascular symptoms were normal.  (R. 470).  On June 10, 2011, Plaintiff again reported insomnia.  (R. 477).  On August 4, 2011, Plaintiff reported no shortness of breath, and his respiratory and cardiovascular symptoms were normal; there is no indication that Plaintiff reported musculoskeletal problems or that any were observed on exam.  (R. 474-75).  RPA Gemelli advised Plaintiff to do more cardiovascular exercise and also physical therapy.  (R. 475). On September 2, 2011, Plaintiff reported no shortness of breath, and there is no indication that he reported back pain.  (R. 466).  On November 23, 2011, Plaintiff's respiratory and cardiovascular symptoms were normal, and there is no indication that he reported back pain.  (R. 460-61).

On January 16, 2012, RPA Gemelli completed a Multiple Impairment Questionnaire and diagnosed lumbar degenerative disc disease, asthma, obstructive sleep apnea, hypertension, hyperthyroid, and hypogonadism causing fatigue, with a fair to good prognosis.  (R. 531-39). Clinical findings included occasional wheezing, shortness of breath, and lower back and leg pain. (R. 531).  RPA Gemelli also reported that laboratory and diagnostic evidence supported his diagnoses, including blood testing, pulmonary function tests, a sleep study, and the MRI from December 30, 2010.  (R. 532).  Plaintiff's primary symptoms were listed as lower extremity

11

numbness and radiculopathy, shortness of breath on exertion, daytime fatigue, lightheadedness, and lower extremity edema.  (R. 532).  RPA Gemelli noted that Plaintiff had "moderate" to "moderately severe" (5 to 7 on a 10-point scale) lumbar pain, exacerbated by excessive strenuous lifting and activity.  (R. 532-33).  Plaintiff also had moderate fatigue (5 out of 10).  (R. 533). RPA Gemelli did not fill out the portions of the Questionnaire concerning Plaintiff's functional limitations.  (R. 533-36).  However, he noted that Plaintiff had significant limitations performing repetitive reaching, handling, fingering, and lifting.  (R. 534).  Further, RPA Gemelli stated that Plaintiff's symptoms were severe enough to periodically interfere with attention and concentration, and that he could tolerate only moderate stress at work.  (R. 537).  RPA Gemelli also noted that Plaintiff required unscheduled breaks to rest every 2 hours during an 8-hour workday and he could not push or pull.  (R. 538).  On February 20, 2012, RPA Gemelli partially completed the same Questionnaire, and he did not indicate any limitations on pushing or pulling. (R. 541-47).

### 5.    Syracuse Orthopedic Specialists

On July 23, 2010, Plaintiff treated with Dr. Warren Wulff at Syracuse Orthopedic Specialists ("SOS"); Plaintiff reported "dysfunction and/or pain in the lumbar spine."  (R. 548). Plaintiff stated that he was in constant lower back pain radiating into his legs with burning numbness and tingling, and that the problem had started after he was hit by falling ice in 2003. (R. 548).  On examination, Dr. Wulff found that Plaintiff walked comfortably without an assistive device, was able to balance on his toes and heels and climb onto the exam table, exhibited full 5/5 motor strength and normal sensation in the spinal area, and demonstrated

normal leg reflexes and straight-leg raising,[6] and overall no atrophy.  (R. 549).  Dr. Wulff noted

that Plaintiff's lumbar flexibility was moderately limited secondary to pain and there was

tenderness to palpation at the lumbosacral junction.  (R. 549).  Plaintiff also had X-rays of the

lumbar spine which showed degenerative disc disease; the findings were "typical age appropriate

degenerative changes with no evidence of trauma or deformity."  (R. 550).  Dr. Wulff stated that

Plaintiff had 50% temporary impairment for "disability-work" status.  (R. 550).

### 6.    Additional Testing

On April 16, 2010, Plaintiff underwent pulmonary function testing, which showed "mild"

obstruction and "mild" restriction, with a notation indicating "maybe poor initial effort."  (R.

411).  On November 8, 2010, Plaintiff underwent additional pulmonary function testing, which

showed "significant improvement."  (R. 332).  On June 10, 2011, Plaintiff underwent an

echocardiogram, which showed among other things, a normal left ventricular ejection fraction.

(R. 989).

### 7.    Consultative Examination by Dr. Robi Rosenfeld

On February 15, 2011, Plaintiff underwent a consultative internal medicine examination

with Dr. Rosenfeld.  (R. 343-47).  Plaintiff reported lower back and leg pain, COPD, sleep

apnea, hypertension, and chronic sinus problems.  (R. 343).  Plaintiff stated that he showers and

dresses himself, watches television and reads, but his wife cooks, cleans, shops, and does the

laundry.  (R. 344).  Dr. Rosenfeld noted that Plaintiff was obese, weighing 273 pounds.  (R. 344-

---

[6] The Straight Leg Raising test "has been used as the primary test to diagnosis lumbar disc herniations."  *Reisinger v. Commr. of Soc. Sec.*, No. 16 Civ. 428, 2017 WL 2198965, at *4 n.6, 2017 U.S. Dist. LEXIS 75670, at *10 n.6 (N.D.N.Y. May 18, 2017) (citing Majlesi J, Togay H, Unalan H, Toprak S., *The sensitivity and specificity of the Slump and the Straight Leg Raising tests in patients with lumbar disc herniation*, http://www.ncbi.nlm.nih.gov/pubmed/18391677).

45).  Dr. Rosenfeld further noted that Plaintiff's gait was normal, that he could walk on his heels

and toes without difficulty, that he did not use any assistive devices, that he needed no help

changing for the exam or getting on and off the exam table, that he was able to rise from his

chair without difficulty, but that he was only able to squat about one-third of the way due to back

pain.  (R. 345).  On examination, Plaintiff's chest and lungs were normal.  (R. 345).  In the

musculoskeletal portion of the report, Dr. Rosenfeld noted that Plaintiff's cervical spine showed

"full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally;

Plaintiff's lumbar spine showed flexion/extension at 30 degrees, lateral flexion on the left 10

degrees and right 10 degrees, and rotation on the right and left 20 degrees.  (R. 345-46).  Plaintiff

had negative sitting straight leg test results and full range of motion in the shoulders, elbows,

wrists, and hands bilaterally.  (R. 346).  Dr. Rosenfeld diagnosed low back pain, COPD,

hypertension, chronic sinusitis, and sleep apnea.  (R. 346).  In the medical source statement, Dr.

Rosenfeld opined that, due to low back pain, Plaintiff had a "moderate restriction" for heavy

lifting, carrying, bending, climbing stairs, and kneeling.  (R. 346).

### 8.     Consultative Examination by Dr. Rita Figueroa

On May 29, 2015, Plaintiff underwent an additional consultative internal medicine

examination with Dr. Figueroa, and reported back pain, COPD, and hypertension.  (R. 921-25).

As to daily activities, Plaintiff said that he did not do any cooking, cleaning, laundry, or shopping

"because of difficulty with bending for prolonged periods of time" and difficulty with walking.

(R. 922-23).  Plaintiff showered and dressed himself, but had difficulty putting his socks on; he

also watched television and listened to the radio.  (R. 923).  On examination, Plaintiff weighed

224 pounds, his gait was normal, his chest and lungs were normal, his squat was 50%, and he

14

had limited range of motion in the lumbar spine and decreased abduction and adduction of the hips. (R. 923-24). Dr. Figueroa diagnosed chronic back pain, COPD, hypertension, and cardiomyopathy. (R. 924-25). Dr. Figueroa opined that Plaintiff may have limitations with activities requiring moderate exertion due to his COPD, and that due to chronic back pain, he may have moderate limitations with activities requiring repetitive bending, lifting, carrying, prolonged standing, and walking. (R. 925). Dr. Figueroa also completed a separate and more detailed medical source statement, where she opined that: Plaintiff was able to sit no more than 2 hours total, stand 1 hour total, and walk 1 hour total in an 8-hour workday; he could frequently lift and carry 10 pounds and occasionally 20 pounds; he was restricted to only occasionally reach and push/pull with his arms; he could never climb ladders, ropes, or scaffolds, and only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; and he could never be exposed to unprotected heights and only occasionally operate a motor vehicle, tolerate humidity and wetness, and be exposed to pulmonary irritants, extreme heat and cold, and vibrations. (R. 926-31). The form also asked "if you have sufficient information to form an opinion within a reasonable degree of medical probability as to past limitations, on what date were the limitations you found above first present," which Dr. Figueroa did not answer. (R. 931).

### D.    The ALJ's Decision Denying Benefits

On July 24, 2015, ALJ Greener issued a decision denying Plaintiff's claim for disability benefits. (R. 572-84). At step one of the five-step evaluation process,[7] the ALJ determined that

---

[7] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of

Plaintiff had not engaged in any substantial gainful activity since the alleged onset date, January 27, 2010, through his date last insured, December 31, 2011.  (R. 574).  At step two, the ALJ determined that, under 20 C.F.R. § 404.1520(c), Plaintiff had six severe impairments: degenerative disc disease, lumbar spine; obesity; high blood pressure; cardiomyopathy; asthma; and COPD.  (R. 574-75).  The ALJ also stated that Plaintiff had a number of "not medically determinable and non-severe impairments," specifically: left shoulder, sleep apnea, sinus problems/allergies, and mental impairment.  (R. 575-77).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (R. 577) (citing 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  The ALJ stated that "the record did not evidence motor loss, reflex loss, or positive seated and supine straight-leg raising tests," and the record also "did not evidence the requisite cardiac or pulmonary findings."  (R. 577-78).  Thus, the ALJ found that the requirements of Listings 1.04, 3.02, 3.03, and 4.02 were not satisfied.

At step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") [8] and found that he could perform sedentary work as defined in 20 C.F.R. § 404.1567(a),[9] except that

---

continuing in his prior type of work, the Commissioner must find him disabled if  (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)  (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106  (2d Cir. 2003))  (internal quotation marks and punctuation omitted).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[8] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" his limitations. 20 C.F.R. § 404.1545 (a) (1).  The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. § 404.1545(b).  The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work."  *Id*.

16

he must avoid: working at heights; climbing stairs, ladders, or scaffolds; working with machinery with unprotected moving parts, and further, "his environment needed to be indoors and climate controlled, and if there was dust exposure he needed to be able to wear a protective mask or other device to minimize the exposure."  (R. 578).  In making these findings, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p."  (R. 578).  The ALJ also stated that she considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  (R. 578).

In considering Plaintiff's alleged symptoms, the ALJ followed a two-step process: first, she determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms; and second, after finding such impairments, she evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limited his functioning.  (R. 578).  Applying this two-step process, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible."  (R. 582).  The ALJ stated that although Plaintiff "alleged

---

[9] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).  Furthermore, "occasionally" means "occurring from very little up to one-third of the time.  Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."  Social Security Ruling 83-10.

17

pain, numbness in his legs, shortness of breath, trouble sleeping, and a limited ability to walk,

stand, bend, squat, lift, sit, climb stairs, and kneel," those allegations "were not entirely

supported by the objective medical evidence, the claimant's treatment history, or his treatment

notes." (R. 578).

In support of this finding and the overall RFC, the ALJ noted various evidence in

Plaintiff's medical history and assigned weight to the opinions of the medical professionals,

stating in relevant part as follows:

1) In April 2010, pulmonary function testing evidenced only "mild" obstruction, "mild" restriction, and the possibility of poor initial effort.

2) On April 16, 2010, Cheryl L. Clark, M.U. noted that the claimant could not do anything that required him to lift over 10 pounds, could not walk long distances, and could not bend or kneel. At that time, Dr. Clark did not mention any limitations in the claimant's ability to sit or the need to get up every 15 to 20 minutes. Then, just a few days later, on April 20, 2010, Dr. Clark opined that the claimant could lift and/or carry 20 pounds occasionally and five pounds frequently, sit up to one hour in an eight-hour day, and stand/walk two hours in an eight-hour day; but needed to avoid fumes, gases, temperature extremes, humidity, and dust and should not push, pull, kneel, bend, or stoop. Dr. Clark also indicated that the claimant must get up and move around every 15 to 20 minutes, would need unscheduled breaks, was capable of low stress, constantly experienced symptoms severe enough to interfere with attention and concentration, and would likely be absent from work two to three times a month. Dr. Clark's opinions were inconsistent. Furthermore, his opinions were not entirely supported by the objective medical evidence, the claimant's treatment history, or the claimant's treatment notes. Therefore, Dr. Clark's opinions were given limited weight.

3) Upon orthopedic examination, in July 2010, the claimant walked comfortably without an assistive device, was able to climb onto the exam table and balance on his toes and heels, and exhibited 5/5 motor strength, normal sensation, 2/2 reflexes, negative straight-leg raising tests, and no atrophy. Although X-rays of the claimant's lumbar spine showed degenerative disc disease, the findings were "typical age appropriate degenerative changes with no evidence of trauma or deformity."

18

4) In November 2010, the claimant's pulmonary function test evidenced significant improvement with medication. An echocardiogram, that same month, demonstrated a greater than 70 percent ejection fraction. Additionally, the claimant had equal and strong straight-leg raising tests and a steady and normal gait. In December 2010, a pulmonary function test showed "mild" obstructive airway disease that improved with medication.

5) The claimant's primary care provider's treatment notes from 2010 and 2011 contained only sporadic complaints of pain and fatigue and documented very few musculoskeletal examinations.

6) As of January 2011, the claimant continued to smoke cigarettes, but nonetheless had clear lungs and reported no shortness of breath. In February 2011, the claimant reported no hospitalizations and that his blood pressure was controlled with medication and had clear lungs and a 96 percent oxygen saturation rate on room air. That same month, the claimant's pulmonary function test showed "mild" obstructive airway disease that improved with medication, and his chest X-ray was negative.

7) Upon consultative examination, on February 15, 2011, the claimant walked on his heels and toes without difficulty, needed no help changing for the exam or getting on and off of the exam table, rose from a chair without difficulty, and had a normal gait and stance, clear lungs, negative seated straight-leg raising tests, full range of motion in his lower extremities, physiologic and equal deep tendon reflexes, 5/5 strength, and no muscle atrophy. Robi Rosenfeld, D.O. opined that the claimant had moderate restriction for heavy lifting, carrying, bending, climbing stairs, and kneeling. Although the consultative examiner did not review the claimant's records, given his personal examination and the general support found in the evidence of record, Dr. Rosenfeld's opinion was given some weight. However, the objective medical evidence did not support bending or kneeling limitations.

8) In March 2011, the claimant reported no shortness of breath and relayed that his blood pressure was under control now that he was taking blood pressure medication. His lungs were clear bilaterally upon examination, and his EKG did not evidence the voltage criteria for left ventricular hypertrophy. At that time, cardiologist, Robert Carhart, M.D. concluded that not all of the claimant's symptoms were consistent with hypertrophic cardiomyopathy and decided to do nothing further and simply re-evaluate the claimant in a few months. Although the claimant had stopped smoking for a couple months, by May 12, 2011, he was smoking cigarettes again. As of June 2011, the claimant's lungs were clear and cardiac status was stable with no symptoms. Dr. Carhart made no changes to the claimant's treatment regimen. That same

month, the claimant's echocardiogram demonstrated a normal left ventricular ejection fraction.

9) In June 2011, the claimant's pulmonologist, Sherif G. El Bayadi, M.D. indicated that the claimant should avoid work involving climbing and heights; should avoid power machines, moving machinery, or other hazardous conditions; had serious limitations maintaining attention for two hour segments; was capable of low stress; would need breaks to rest at unpredictable intervals; and would likely be absent from work two to three times a month.  However, the claimant's treatment notes and the objective medical evidence did not support Dr. El Bayadi's opinion regarding maintaining attention, low stress, breaks, or absences from work.  Additionally, Dr. El Bayadi indicated that the claimant's prognosis was good with therapy, and subsequent records showed improvement and no complaints regarding the CPAP.  Therefore, the portions of Dr. El Bayadi's opinion regarding maintaining attention, low stress, breaks, and absences from work were given limited weight.  The remainder of Dr. El Bayadi's opinion was given great weight based on Dr. El Bayadi's specialty and treatment history with the claimant.

10) In August 2011, the claimant reported no chest pain and no shortness of breath and had clear lungs.  At that time, the claimant's primary care provider, Vincent Gemelli, PA, advised the claimant to attend physical therapy, but did not document any musculoskeletal clinical findings.

11) In September 2011, the claimant felt well from a cardiac standpoint, and his cardiologist characterized his heart conditions as stable and made no changes to his treatment regimen.  At that time, the claimant reported keeping active and riding a stationary bike a little bit every day.  Additionally, when the claimant saw his primary care provider, that month, he did not complain of back pain and reported no shortness of breath.

12) In December 2011, Dr. Carhart responded to a questionnaire and indicated that the claimant's clinical findings included shortness of breath, fatigue, weakness, edema, and dizziness/syncope.  However, Dr. Carhart gave no response to questions regarding the claimant's exertional abilities.

13) In January 2012, Dr. Carhart noted that, from a cardiac perspective, the claimant could not be subjected to environmental extremes, could not be subjected to any excessive stress, and would be limited in the amount of lifting he would be allowed to do.  Given Dr. Carhart's specialty and treatment history with the claimant, that portion of Dr. Carhart's opinion was given great weight.  Dr. Carhart also noted that "because of issues with his back . . . [the claimant] was having problems standing and sitting in place for

periods of time."  However, Dr. Carhart is a cardiologist and did not examine
or treat the claimant for orthopedic problems.  Furthermore, that opinion was
not supported by the claimant's treatment notes or clinical findings.
Therefore, the portion of Dr. Carhart's opinion regarding standing and sitting
was given limited weight.

14) Rita Figueroa, M.D. did not review the claimant's records and did not
examine the claimant until years after the date last insured.  Therefore, her
opinion was given no weight regarding the period through the date last
insured.

(R. 578-82) (internal citations to Plaintiff's medical records omitted).  The ALJ further stated

that, "[g]iven the claimant's negative clinical findings, the limited positive objective medical

findings, the claimant's improvement with conservative treatment, the opinion of Dr. Rosenfeld,

and the supported portions of Dr. El Bayadi's and Dr. Carhart's opinions, the above residual

functional capacity finding is supported."  (R. 582).

At step five, having determined Plaintiff's limitations, the ALJ determined that Plaintiff

was unable to perform any of his past relevant work.  (R. 582).  Next, the ALJ considered

whether there were other jobs in significant numbers in the national economy for someone

Plaintiff's age, with his education, work experience, and RFC.  (R. 582).  Based on the testimony

of a vocational expert, who identified jobs as a document preparer, charge account clerk, and

food and beverage order clerk, the ALJ concluded that "considering the claimant's age,

education, work experience, and residual functional capacity, the claimant was capable of

making a successful adjustment to other work that existed in significant numbers in the national

economy."  (R. 583).  Therefore, the ALJ found that Plaintiff was not disabled.  (R. 583-84).

## III.    DISCUSSION

### A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled.  Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).  "Substantial evidence is 'more than a mere scintilla.'  It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion."  *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447-48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).  The substantial evidence standard is "very deferential" and the Court can reject the facts that the ALJ found "'only if a reasonable factfinder would *have to conclude otherwise*.'"  *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

## B.    Analysis

Plaintiff argues that the ALJ erred in several ways, specifically that: 1) the ALJ failed to properly weigh the medical opinion evidence; 2) the ALJ failed to properly evaluate Plaintiff's credibility; and 3) the ALJ failed to adequately consider Plaintiff's obesity.  (Dkt. No. 9).

### 1.    Evaluation of Medical Opinion Evidence

Plaintiff argues that the "ALJ's rejection of the opinions from treating physicians, Drs. Clark, El Bayadi, and Carhart based on his conclusions that unspecified 'objective' testing, treatment records, and Mr. Mott's course of treatment do not support the limitations is contrary to the medical record and law from the Second Circuit."  (Dkt. No. 9, p. 16).  Plaintiff contends that the opinions from these treating physicians "should have been controlling" because they are "based on medically appropriate clinical and diagnostic testing and are uncontradicted by other

22

substantial evidence in the record." (*Id.*, p. 20).

According to the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).  In other words, the treating physician's opinion is not afforded controlling weight where it is inconsistent with other substantial evidence in the record, including opinions from other medical experts.  *Id.* (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).  When the ALJ opts not to give a treating physician's opinion controlling weight, she must provide "good reasons" for doing so.  *Id.* at 129 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  "In order to override the opinion of a treating physician, . . . the ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  *See also* 20 C.F.R. § 404.1527(c).

Dr. Clark diagnosed Plaintiff with degenerative disc disease, hypertension, and COPD, and opined that among other things, Plaintiff could sit for less than 1 hour and stand/walk for only 2 hours total in an 8-hour workday, and that Plaintiff's pain, fatigue, or other symptoms were constantly severe enough to interfere with his attention and concentration.  (R. 264-66). However, the ALJ gave these opinions "limited weight," finding them inconsistent and "not entirely supported by the objective medical evidence, the claimant's treatment history, or the

23

claimant's treatment notes."  (R. 579).  The ALJ correctly noted that Dr. Clark assessed the

above limitations on April 20, 2010, but failed to note the same limitations in notes written on

April 16, 2010.  (R. 276-77, 280-81).  The ALJ's decision also identified medical evidence that

ran contrary to Dr. Clark's opinions, including: 1) pulmonary function testing in April 2010

which showed only mild obstruction and restriction (R. 411); 2) mostly normal physical

examination findings by an orthopedist in July 2010, including negative straight leg test results

and full 5/5 motor strength and normal sensation in the spinal area (R. 549); 3) X-rays of the

lumbar spine in July 2010, which showed degenerative disc disease but only "typical age

appropriate degenerative changes with no evidence of trauma or deformity" (R. 550); 4)

pulmonary function testing in November 2010 which showed significant improvement (R. 332);

and 5) and mostly normal physical examination findings by Dr. Rosenfeld on February 15, 2011,

which showed that Plaintiff's gait was normal, he had full range of motion in his lower

extremities, and negative sitting straight leg test results.  (R. 345-46).  The ALJ further noted that

Plaintiff's "primary care provider's treatment notes from 2010 and 2011 contained only sporadic

complaints of pain and fatigue and documented very few musculoskeletal examinations," (R.

579), which is supported by the record.  (R. 460-97).  Thus, the ALJ gave good reasons

supported by substantial evidence for assigning limited weight to Dr. Clark's opinion.

As to Dr. Carhart, Plaintiff argues that the ALJ erred in only giving "limited weight" to

Dr. Carhart's opinion that Plaintiff's back issues caused him problems standing and sitting in

place for long periods of time.[10]  (R. 581).  However, the ALJ gave good reasons for doing so.

First, the ALJ noted that Dr. Carhart, a cardiologist, "did not examine or treat the claimant for

[10] The ALJ gave great weight to Dr. Carhart's opinion that Plaintiff was limited from any type of lifting and from exposure to environmental extremes and excessive stress.  (R. 581).

orthopedic problems" (*id.*), and thus, the ALJ properly accounted for the nature of treatment and Dr. Carhart's lack of expertise in assessing back-related limitations.  Second, the ALJ stated that Dr. Carhart's opinion "was not supported by the claimant's treatment notes or clinical findings," (R. 581), and as discussed above, the ALJ cited substantial evidence showing that Plaintiff's back problems were not as severe as Dr. Carhart found.[11]

Further, the ALJ gave good reasons for assigning "limited weight" to Dr. El Bayadi's opinion that, due to pulmonology and sleeping problems, Plaintiff had serious limitations maintaining attention for two hour segments, was only capable of low stress, would need breaks at unpredictable intervals, and would likely be absent from work two to three times a month.[12] (R. 580).  The ALJ explained that "the claimant's treatment notes and the objective medical evidence did not support Dr. Bayadi's opinion," and that "subsequent records showed improvement and no complaints regarding the CPAP."  (R. 580).  These reasons are supported by substantial evidence, including Plaintiff's mostly "mild" pulmonary function test results (R. 332, 411, 439, 441), and records showing that Plaintiff's condition improved with treatment.  (R. 332, 424, 895).[13]

---

[11] To the extent Plaintiff argues that the ALJ did not explicitly consider all of the factors in 20 C.F.R. § 404.1527(c) in evaluating Dr. Carhart's opinion (Dkt. No. 9, p. 20), where, as here, "an ALJ's reasoning and adherence to the Regulations are clear, the ALJ is not required to review explicitly each and every factor of the Regulation." *McQuade v. Colvin*, No. 14 Civ. 1044, 2015 WL 7283185, at *6, 2015 U.S. Dist. LEXIS 154186, at *18 (N.D.N.Y. Nov. 16, 2015); *see also Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor [in 20 C.F.R. § 404.1527(c)] where the ALJ's reasoning and adherence to the regulation are clear."); *Jones v. Colvin*, No. 16 Civ. 443, 2017 WL 758511, at *4, 2017 U.S. Dist. LEXIS 26605, at *12 (N.D.N.Y. Feb. 27, 2017) ("Here, although the ALJ did not explicitly state each of factors in 20 C.F.R. § 404.1527(c), her reasoning for according no weight to Dr. Ho's opinion is clearly reflected in her decision.").

[12] The ALJ gave great weight to Dr. El Bayadi's opinion that Plaintiff should avoid work involving climbing and heights, power machines, moving machinery or other hazardous conditions.  (R. 580).

[13] Plaintiff argues that the ALJ "also erred by concluding that the treating source opinions should be discounted due to Mr. Mott's conservative course of treatment during the period at issue."  (Dkt. No. 9, p. 17).  However, the ALJ did not cite conservative treatment as a reason for discounting the opinions of Drs. Clark, El Bayadi, and Carhart.

Next, Plaintiff argues that the ALJ erred in relying on the opinion of Dr. Rosenfeld, who only examined Plaintiff once and did not review any of his medical records.  (Dkt. No. 9, pp. 18-19).  The ALJ gave "some weight" to Dr. Rosenfeld's opinion that that Plaintiff had "moderate restriction" for heavy lifting, carrying, bending, climbing stairs, and kneeling, based on his personal examination of Plaintiff and "general support found in the evidence of record." (R. 579-80).  The ALJ noted, however, that "the objective medical evidence did not support bending or kneeling limitations."  (R. 580).  "It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions." *Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (citing *Rosier v. Colvin*, 586 F. App'x 756, 758 (2d Cir. 2014)).  Moreover, "[t]he elements of a complete consultative examination do not require that the examiner review all, or any, medical evidence in the record." *Schneider v. Commr. of Soc. Sec.*, No. 15. Civ. 590, 2016 WL 5019059, at *6, 2016 U.S. Dist. LEXIS 127378, *18 (N.D.N.Y. Aug. 26, 2016) (citing 20 C.F.R. §§ 404.1519n(b)-(c), 416.919n(b)-(c)), *report and recommendation adopted sub nom. Schneider v. Colvin*, No. 15 Civ. 590, 2016 WL 4997090, 2016 U.S. Dist. LEXIS 127075 (N.D.N.Y. Sept. 19, 2016).

Therefore, the ALJ did not err in relying on Dr. Rosenfeld's opinion, along with other substantial evidence in the record, in determining Plaintiff's RFC.  The ALJ found that Plaintiff

---

Rather, the ALJ stated that her RFC finding was supported by "the claimant's negative clinical findings, the limited positive objective medical findings, the claimant's improvement with conservative treatment, the opinion of Dr. Rosenfeld, and the supported portions of Dr. El Bayadi's and Dr. Carhart's opinions."  (R. 582).  Moreover, the ALJ did not err in considering Plaintiff's conservative course of treatment as part of the overall RFC assessment.  *See Smith v. Colvin*, No. 12 Civ. 1098, 2015 WL 3970932, at *8, 2015 U.S. Dist. LEXIS 84987, at *20 (W.D.N.Y. June 30, 2015) ("[T]he ALJ's residual functional capacity analysis was supported by substantial evidence, including . . . conservative pain treatment by means of medication and physical therapy."); *see also Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("The fact that a patient takes only over-the-counter medicine to alleviate her pain may . . . help to support the Commissioner's conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record, such as the opinions of other examining physicians and a negative MRI.").

could perform sedentary work, except that he needed to avoid working at heights, climbing stairs, ladders, or scaffolds, and working with machinery with unprotected moving parts, and further, "his environment needed to be indoors and climate controlled, and if there was dust exposure he needed to be able to wear a protective mask or other device to minimize the exposure." (R. 578). This assessment is largely consistent with Dr. Rosenfeld's opinion,[14] as well as portions of the opinions of Drs. Carhart and El Bayadi that stated that Plaintiff should avoid work involving lifting, climbing and heights, power machines, moving machinery or other hazardous conditions, and exposure to environmental extremes and excessive stress. Moreover, the ALJ cited ample additional evidence for this RFC, as discussed above.

Plaintiff also argues that "the ALJ erred by rejecting the opinions from a second consultative examiner, Dr. Figueroa, because this doctor evaluated Mr. Mott after the date last insured." (Dkt. No. 9, p. 21). The ALJ explained that she gave no weight to Dr. Figueroa's opinion because she "did not review the claimant's records and did not examine the claimant until years after the date last insured." (R. 582). "To be eligible for disability benefits, the claimant must demonstrate that she was disabled on the date she was last insured for benefits." *Swainbank v. Astrue*, 356 F. App'x 545, 547 (2d Cir. 2009); *see also* 42 U.S.C. § 423(a)(1)(A). In this case, Plaintiff's date last insured was December 31, 2011 (R. 572), and Plaintiff was not evaluated by Dr. Figueroa until May 29, 2015. (R. 921-25). In Dr. Figueroa's evaluation, she did not provide an opinion as to Plaintiff's past limitations. (R. 931). Thus, although Dr. Figueroa found that Plaintiff had more severe limitations in 2015, her opinion has very limited

---

[14] *See also Gillie v. Colvin*, No. 15 Civ. 6425, 2016 WL 4586158, at *5, 2016 U.S. Dist. LEXIS 119500, at *14 (W.D.N.Y. Sept. 3, 2016) ("[T]he ALJ's finding that Plaintiff could perform a range of sedentary work is consistent with consultative physician Dr. Sirotenko's report, which included no limitations on sitting, the major functional activity involved in sedentary work.").

value in assessing Plaintiff's RFC for the time period on or before the date last insured, and the ALJ did not err in rejecting it. *See Vilardi v. Astrue*, 447 F. App'x 271, 272 (2d Cir. 2012) (finding that the plaintiff's "reliance on evidence demonstrating a worsening of her condition after that date [last insured] is of little value"); *Behling v. Com'r of Soc. Sec.*, 369 F. App'x 292, 294 (2d Cir. 2010) (finding that any "new impairments are not relevant" to whether the plaintiff was disabled as of the date on which she was last insured); *Bolea v. Colvin*, No. 15 Civ. 6402, 2016 WL 7104231, at *3, 2016 U.S. Dist. LEXIS 168086, at *9 (W.D.N.Y. Dec. 6, 2016) (discounting opinions rendered four and five years after the date last insured).

In sum, the ALJ did not err in evaluating the opinion evidence and Plaintiff's RFC is supported by substantial evidence.

### 2.    Credibility Assessment

Plaintiff also argues that the ALJ failed to properly evaluate his credibility. (Dkt. No. 9, pp. 22-23). "When assessing a claimant's credibility, the ALJ must consider both his medical records and his reported symptoms." *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 248 (N.D.N.Y. 2013) (citing 20 C.F.R. § 404.1529). "A claimant's statements about his condition, on their own, are not enough to establish disability." *Id.* However, a claimant's statements of pain and limitation are entitled to great weight where they are supported by objective medical evidence. *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992). If a claimant's testimony is not supported by objective medical evidence, the ALJ employs a two-step process to evaluate the claimant's reported symptoms: 1) the ALJ determines if the claimant has medically determinable impairments that could produce the alleged systems; and 2) if the impairments do exist, the ALJ evaluates the intensity, persistence, and limiting effects of the symptoms to determine the extent

to which the symptoms limit the claimant's ability to work.  *See* 20 C.F.R. § 404.1529(a); Social

Security Ruling 96-7p.[15]  In so doing, the ALJ considers the following:

1)  the claimant's daily activities;

2)  the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3)  precipitating and aggravating factors;

4)  type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms;

5)  other treatment the claimant receives or has received to relieve his pain or other symptoms; any measures the claimant takes or has taken to relieve his pain or other symptoms; and

6)  any other factors concerning the claimant's functional limitations and restrictions due to his pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).  "After considering the objective

medical evidence, the claimant's demeanor and activities, subjective complaints, as well as any

inconsistencies between the medical evidence and the claimant's subjective complaints, an ALJ

may accept or disregard the claimant's subjective testimony as to the degree of impairment."

*Pidkaminy*, 919 F. Supp. 2d at 249.  "An ALJ who rejects the subjective testimony of a claimant

must do so explicitly and with sufficient specificity to enable the Court to decide whether there

are legitimate reasons for the ALJ's disbelief and whether h[er] decision is supported by

substantial evidence."  *Id.* (internal quotations and citation omitted).  In general, courts "afford

great deference to the ALJ's credibility finding, since the ALJ had the opportunity to observe

---

[15] SSR 96-7p has since been superseded by SSR 16-3p, which became effective March 28, 2016, after the ALJ issued her decision.

[the claimant's] demeanor while [the claimant was] testifying." *Kessler v. Colvin*, 48 F. Supp. 3d 578, 595 (S.D.N.Y. 2014) (citation omitted).

Here, Plaintiff alleged symptoms including back and leg pain, fatigue, and shortness of breath, which limited his ability to walk, stand, bend, squat, sit, and concentrate. (R. 45-46, 53-54, 56, 62). The ALJ applied the two-step process and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible." (R. 582). Although Plaintiff argues that the ALJ failed to explain this determination with sufficient specificity, the ALJ stated that, "[a]s was delineated above, the claimant's allegations were not entirely supported by his treatment notes, the objective medical findings, or his treatment history." (*Id.*). Thus, the ALJ cited the same specific, medical evidence discussed in Part III(B)(1), which also showed that Plaintiff's impairments were less severe than he alleged. The ALJ also pointed out that, in 2010 and 2011, Plaintiff's primary care provider noted only sporadic complaints of pain and fatigue, (R. 460-97), and as of September 15, 2011, Plaintiff reported that he "keeps active and he rides a stationary bike a little bit every day." (R. 454). The ALJ further noted that Plaintiff continued to smoke cigarettes at times in 2010 and 2011, despite his alleged breathing problems, (R. 322, 438, 469), and that Plaintiff's lungs were repeatedly found to be clear on examination. (R. 345, 424, 452).

Thus, the Court will not second-guess the ALJ's credibility determination, since she employed the proper methodology and based her determination on specific reasons supported by substantial evidence in the record. *See Tricarico v. Colvin*, 15-3786, 2017 WL 902603, at *2, 2017 U.S. App. LEXIS 3821, *8 (2d Cir. Mar. 3, 2017) (finding that the ALJ appropriately

assessed the plaintiff's credibility "given conflicting evidence in the record and in [the plaintiff's] own account of his limitations"); *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) ("We have no reason to second-guess the credibility finding in this case where the ALJ identified specific record-based reasons for his ruling."); *Weathers v. Colvin*, No. 15 Civ. 575, 2017 WL 177649, at *6, 2017 U.S. Dist. LEXIS 5944, at *17 (N.D.N.Y. Jan. 17, 2017) ("In this case, the Court will not second-guess the ALJ's credibility finding because she identified specific record-based reasons for her ruling."); *Rodriguez v. Colvin*, No. 13 Civ. 915, 2016 WL 1337345, at *5, 2016 U.S. Dist. LEXIS 45796, at *12-13 (N.D.N.Y. Apr. 5, 2016) ("Contrary to Plaintiff's assertion, the ALJ did not commit reversible error by declining to expressly address all of the relevant factors in his written decision . . . . the Court finds that the ALJ sufficiently analyzed Plaintiff's subjective allegations to the extent that they were not substantiated by objective medical evidence.") (citing *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013)).

### 3.    Obesity Consideration

Finally, Plaintiff argues that the ALJ "failed to consider the impact of Mr. Mott's obesity on his residual functional capacity or the impact it had on the claimant's other severe impairments." (Dkt. No. 9, p. 24). According to the Regulations, obesity "is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity," and further "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Therefore, the Regulations instruct that:

> [W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other

> steps of the sequential evaluation process, including when assessing an
> individual's residual functional capacity, adjudicators must consider any
> additional and cumulative effects of obesity.

*Id.* Social Security Ruling 02-1P provides additional guidance on how adjudicators evaluate

obesity in disability claims, noting among other things, that obesity can cause limitation of

function, the combined effects of obesity with other impairments may be greater than might be

expected without obesity, and that obesity should be factored into the RFC assessment. *See*

Titles II and XVI: Evaluation of Obesity, SSR 02-1P (Sept. 12, 2002).

  In this case, the ALJ specifically noted that Plaintiff had weighed up to 288 pounds and

found that Plaintiff's obesity constituted a severe impairment. (R. 574). Although the ALJ did

not explicitly address how Plaintiff's obesity factored into his RFC, she nonetheless based her

assessment on medical opinions and evidence that did account for Plaintiff's obesity. Plaintiff

testified at the hearing that he weighed 255 pounds (R. 40),[16] and his medical records

consistently show that he was obese and weighed up to 288 pounds. (R. 439). Dr. El Bayadi

noted in 2010 that Plaintiff weighed 273 pounds and had a BMI of 48 (R. 444), and Dr.

Rosenfeld noted in 2011 that Plaintiff was obese and weighed 273 pounds (R. 344-45), but

neither doctor indicated that Plaintiff's obesity caused or contributed to any functional

limitations. Dr. Carhart completed a Cardiac Impairment Questionnaire for Plaintiff on

September 15, 2011, and he did not assess any obesity-related risks or limitations.[17] (R. 522-27).

Thus, the ALJ implicitly considered the combined effects of Plaintiff's obesity with his other

---

[16] Plaintiff did not identify any obesity-related limitation in his testimony.

[17] To the extent Plaintiff argues that the ALJ failed to account for Dr. Carhart's opinion in 2015 that Plaintiff's obesity increased his *risk* for back and joint pain and hypertension and coronary artery disease (Dkt. No. 9, p. 24), that opinion, which did not identify any actual obesity-related limitation, was also long after the date last insured. (R. 1127).

impairments as demonstrated by her thorough review of the medical opinions and evidence, which did not show any such impact.  Accordingly, the ALJ did not err in addressing Plaintiff's obesity, and as discussed above, Plaintiff's RFC is supported by substantial evidence.  *See Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011) ("[W]e agree with the District Court that the ALJ implicitly factored Drake's obesity into his RFC determination by relying on medical reports that repeatedly noted Drake's obesity and provided an overall assessment of her work-related limitations."); *Kelly v. Colvin*, 15 Civ. 775, 2016 WL 5374113, at *8, 2016 U.S. Dist. LEXIS 130963, at *25 (N.D.N.Y. Sept. 26, 2016) ("Although obesity, in itself, can be considered a disability, the ALJ appropriately considered plaintiff's obesity insofar as he reviewed the limitations opined by plaintiff's physicians and took those opinions into account in rendering his RFC."); *Caron v. Colvin*, No. 12 Civ. 1824, 2014 WL 3107959, at *10, 2014 U.S. Dist. LEXIS 92187 (N.D.N.Y. July 8, 2014) (finding no error where the ALJ indirectly discussed the plaintiff's obesity), *aff'd*, 600 F. App'x 43 (2d Cir. 2015); *Paulino v. Astrue*, No. 08 Civ. 2813, 2010 WL 3001752, at *18, 2010 U.S. Dist. LEXIS 77070, at *56 (S.D.N.Y. July 30, 2010) ("An ALJ's final determination can constitute an appropriate consideration of the effects of obesity if it properly weighs evaluations by doctors that have accounted for the claimant's obesity.") (citing cases).

IV.    **CONCLUSION**

For these reasons it is

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

ORDERED that the Clerk close this case and provide a copy of this Memorandum-

Decision and Order to the parties.

IT IS SO ORDERED.

July 11, 2017
Syracuse, NY

Brenda K. Sannes
U.S. District Judge